MARY CAROL RORRER v. ARTHUR O. COOKE

No. 468PA84

(Filed 7 May 1985)

1. **Rules of Civil Procedure § 56.2— motion for summary judgment—burden of proof**

On his motion for summary judgment, defendant had the initial burden of showing that an essential element of plaintiff's case did not exist as a matter of law or showing through discovery that plaintiff had not produced evidence to support an essential element of her claim. Plaintiff was then required to come forward with a forecast of evidence showing the existence of a genuine issue of material fact with respect to the issues raised by the movant.

2. **Attorneys at Law § 5.1— attorney malpractice—proof required**

In a professional malpractice case predicated upon a theory of an attorney's negligence, the plaintiff has the burden of proving by the greater weight of the evidence: (1) that the attorney breached the duties owed to his client, as set forth in *Hodges v. Carter*, 239 N.C. 517, 80 S.E. 2d 144 (1954), and that this negligence (2) proximately caused (3) damage to the plaintiff.

3. **Attorneys at Law § 5.2— legal malpractice in medical malpractice case—affidavit by attorney—insufficiency to show negligence by defendant**

In a legal malpractice action arising from defendant attorney's representation of plaintiff in a medical malpractice case, an attorney's affidavit was insufficient to forecast proof that defendant's preparation for and conduct of the medical malpractice trial was such that defendant breached his duty of reasonable care and diligence to plaintiff because it failed to state what the standard of care to which defendant was subject required him to do. The mere fact that one attorney testifies that he would have acted contrarily or differently from the action taken by defendant is not sufficient to establish a prima facie case of defendant's negligence.

4. **Attorneys at Law § 5.2— legal malpractice—failure to exercise best judgment—insufficient forecast of evidence**

In a legal malpractice action arising from defendant attorney's representation of plaintiff in a medical malpractice case, plaintiff's affidavits failed to establish material issues of fact as to whether defendant was negligent in failing to exercise his best judgment in good faith at every decision point arising in preparation for and trial of plaintiff's medical malpractice case.

5. **Attorneys at Law § 5.2; Rules of Civil Procedure § 56.4— proximate cause—issue raised in affidavits supporting summary judgment motion—necessity for opposing materials**

In a legal malpractice action arising from defendant attorney's representation of plaintiff in a medical malpractice case, defendant placed the issue of causation squarely before the court when he submitted affidavits in support of his summary judgment motion which specifically addressed the issue of

Rorrer v. Cooke

whether defendant's alleged negligence was· a proximate cause of plaintiff's failure to obtain a favorable jury verdict in her medical malpractice suit, and it became incumbent upon plaintiff to submit affidavits in opposition to this and other issues so presented.

**6. Attorneys at Law § 5.2— attorney malpractice—proximate cause**

To establish in an attorney malpractice case that negligence is a proximate cause of the loss suffered, plaintiff must establish that the loss would not have occurred but for the attorney's conduct.

**7. Attorneys at Law § 5.2— attorney malpractice—proximate cause**

Where the plaintiff bringing a suit for legal malpractice has lost another suit allegedly due to his attorney's negligence, to prove that but for the attorney's negligence, plaintiff would not have suffered the loss, plaintiff must prove that: (1) the criginal claim was valid; (2) it would have resulted in a judgment in plaintiff's failure; and (3) the judgment would have been collectible.

**8. Attorneys at Law § 5.2— attorney negligence—failure to show proximate cause of loss**

In a legal malpractice action arising from defendant attorney's representation of plaintiff in a medical malpractice suit, affidavits presented by plaintiff in response to defendant's motion for summary judgment failed to forecast evidence that would show that defendant's alleged negligence was a proximate cause of the loss of her medical malpractice suit in that they failed to show that there was any other or better theory or any additional admissible evidence other than what defendant attorney considered and used and that plaintiff's suit would have been successful had defendant done anything differently.

ON defendant's petition for discretionary review of a decision of the Court of Appeals, 69 N.C. App. 305, 317 S.E. 2d 34 (1984), reversing judgment entered by *DeRamus, J.,* on 28 March 1983 in Superior Court, ROCKINGHAM County. Heard in the Supreme Court 13 March 1985.

This legal malpractice action arises upon attorney Arthur O. Cooke's representation of plaintiff in a suit for damages based upon the alleged medical malpractice of Dr. Carl A. Sardi. During the instant suit Arthur O. Cooke died and the executrix of his estate was substituted as a party defendant by order of the Court of Appeals dated 21 November 1983.

On or about 25 October 1971 Dr. Sardi, a Greensboro otolaryngologist, performed an adenoidectomy-tonsillectomy upon plaintiff at Moses H. Cone Memorial Hospital in Greensboro. Upon regaining consciousness following the operation, plaintiff discovered she could not manipulate her tongue. She thereafter

experienced great difficulty in eating and talking. Eventually she was examined by a neurologist and by several otolaryngologists at Duke University Medical Center. In March 1972 plaintiff met with Cooke to discuss bringing an action against Dr. Sardi for injuries caused by his alleged negligence.

On behalf of plaintiff, Cooke filed a complaint against Dr. Sardi on 7 June 1974 alleging that he failed to exercise due care in performing the adenoidectomy-tonsillectomy; that as a result of this failure damage was inflicted upon that portion of plaintiff's nervous system which controls her tongue; and that Dr. Sardi's negligent use of a tongue clamp was a proximate cause of plaintiff's injury and damage. The case came on for trial during the 29 May 1978 session of Superior Court, Guilford County, and the jury found for Dr. Sardi. Plaintiff did not appeal.

On 26 August 1982 Mrs. Rorrer filed this action against Cooke alleging that he negligently represented her in the suit against Sardi and, as a proximate result, the medical malpractice case was lost. Cooke moved for summary judgment, which was granted 28 March 1983. Plaintiff appealed to the Court of Appeals, which reversed, holding that because plaintiff's forecast of evidence created material issues of fact, summary judgment was improper. The Supreme Court granted defendant's petition for discretionary review on 8 November 1984.

*McCain & Essen, by Grover C. McCain, Jr. and Jeff Erick Essen, for plaintiff appellee.*

*Smith Moore Smith Schell & Hunter, by Stephen P. Millikin, Alan W. Duncan, and Douglas W. Ey, Jr., for defendant appellant.*

MARTIN, Justice.

The sole issue before this Court is whether the Court of Appeals erred in holding summary judgment for defendant to be improper. For the reasons set forth below we conclude that it did and therefore reverse the decision of the Court of Appeals. The rules governing summary judgment motions are now familiar and need not be repeated here. *See Broadway v. Blythe Industries, Inc.,* 313 N.C. 150, 326 S.E. 2d 266 (1985); *Bone International, Inc. v. Brooks,* 304 N.C. 371, 375, 283 S.E. 2d 518, 520 (1981).

Plaintiff's suit is predicated upon the theory that Cooke negligently represented her during prosecution of her suit against Dr. Sardi. This Court's most thorough discussion of an attorney's legal obligation to his client is set forth in *Hodges v. Carter*, 239 N.C. 517, 519-20, 80 S.E. 2d 144, 145-46 (1954):

> Ordinarily when an attorney engages in the practice of the law and contracts to prosecute an action in behalf of his client, he impliedly represents that (1) he possesses the requisite degree of learning, skill, and ability necessary to the practice of his profession and which others similarly situated ordinarily possess; (2) he will exert his best judgment in the prosecution of the litigation entrusted to him; and (3) he will exercise reasonable and ordinary care and diligence in the use of his skill and in the application of his knowledge to his client's cause. *McCullough v. Sullivan*, 132 A. 102, 43 A.L.R. 928; *Re Woods*, 13 S.W. 2d 800, 62 A.L.R. 904; *Indemnity Co. v. Dabney*, 128 S.W. 2d 496; *Davis v. Indemnity Corp.*, 56 F. Supp. 541; *Gimbel v. Waldman*, 84 N.Y.S. 2d 888; Anno. 52 L.R.A. 883; 5 A.J. 287, 47; Prosser Torts, p. 236, sec. 36; Shearman & Redfield Negligence, sec. 569.

> An attorney who acts in good faith and in an honest belief that his advice and acts are well founded and in the best interest of his client is not answerable for a mere error of judgment or for a mistake in a point of law which has not been settled by the court of last resort in his State and on which reasonable doubt may be entertained by well-informed lawyers. 5 A.J. 335, sec. 126; 7 C.J.S. 979, sec. 142; *McCullough v. Sullivan*, *supra*; *Hill v. Mynatt*, 59 S.W. 163, 52 L.R.A. 883.

> Conversely, he is answerable in damages for any loss to his client which proximately results from a want of that degree of knowledge and skill ordinarily possessed by others of his profession similarly situated, or from the omission to use reasonable care and diligence, or from the failure to exercise in good faith his best judgment in attending to the litigation committed to his care. 5 A.J. 333, sec. 124; *Re Woods*, *supra*; *McCullough v. Sullivan*, *supra*; Anno. 52 L.R.A. 883.

*See generally* Annot., 45 A.L.R. 2d 5 (1956).[1]

Plaintiff does not contend that Cooke did not possess the requisite degree of learning, skill, and ability necessary to the practice of law and which others similarly situated ordinarily possess. Nor would the record support such finding. It is uncontested that Cooke was duly licensed to practice law in North Carolina and engaged in such practice from that time until his death during the pendency of the present litigation. Plaintiff made no challenge to the statements of several of defendant's affiants that Cooke's reputation in Greensboro for the application of his legal skills was excellent. Therefore, the first criterion established by *Hodges* is not at issue.

Plaintiff does claim, however, that the affidavits she submitted in opposition to defendant's motion for summary judgment establish that there is a material question of fact as to whether Cooke's conduct of the litigation of her suit was in accord with the other two criteria set forth in *Hodges*. To place these affidavits in context we first review the undisputed facts as to the course of events culminating in the jury verdict in favor of Dr. Sardi.

Plaintiff first met with Cooke regarding suit against Dr. Sardi on 22 March 1972. At this conference both plaintiff and her husband stated emphatically that Dr. Sardi had told them that the cause of Mrs. Rorrer's tongue paralysis was probably too much pressure exerted by the clamp used during the course of the operation. The Rorrers also told Cooke that plaintiff had been seen and examined by Dr. T. Boyce Cole at the Duke University Medical Center. Mr. Rorrer also stated that Dr. Cole told him that although he had never seen or heard of a paralysis resulting from a tonsillectomy, he felt that something had occurred in the course of the operation to cause the paralysis and that pressure on the tongue was a possible explanation. After the Rorrers left, Mr. Cooke conducted extensive research in various medical treatises

---

1. We note the fundamental differences between care of a patient by the medical profession and the representation by a lawyer of a client during litigation. Doctors are joined together in seeking a single result, while lawyers involved in litigation are acting antagonistically and adversely toward each other and seeking diverse results.

and other written materials in order to understand the medical aspects of Mrs. Rorrer's injury.

Mr. Cooke then obtained a copy of a written report prepared on 6 December 1971 by Dr. Joseph W. Stiefel, a neurologist to whom plaintiff had been sent by Dr. Sardi. This report stated in part:

> I would certainly agree she has a bilateral palsy of the tongue, presumably from the involvement of the 12th nerves bilaterally. I am still inclined to think it will improve as I don't believe it is as atrophic as it should be six weeks after complete interruption of the 12th nerves. I would do nothing at the present except to let a little time go by.

In an affidavit filed with his motion for summary judgment Cooke stated that he

> construed the words "complete interruption" used by Dr. Stiefel as tending to support the fact that Dr. Sardi had discussed an interruption of the 12th nerve with Dr. Stiefel and this further tended to support the supposition that the blood supply to the hypoglossal nerve had been "interrupted", and that this "interruption" had been caused by too much pressure being exerted on Mrs. Rorrer's tongue by the clamp used by Dr. Sardi during the operation, and as not suggesting any other cause. I construed this report of Dr. Stiefel as being entirely consistent with what Mr. and Mrs. Rorrer said had been stated to them by Dr. Sardi and as ruling out any psychosomatic problem as a cause for the tongue paralysis.

Cooke then contacted Dr. Gray Hunter, a Greensboro surgeon, and asked him whether or not it would be possible for the hypoglossal nerve to be severed or cut during the course of a tonsillectomy. Dr. Hunter said that in his opinion it would be virtually impossible for this to occur. As Cooke stated in the aforementioned affidavit, Dr. Hunter's

> opinion strengthened my view that the cause of the paralysis of Mrs. Rorrer's tongue was the pressure exerted on her tongue by the clamp used by Dr. Sardi, which pressure had impaired the flow of blood to the hypoglossal nerve. Dr.

Hunter had no other explanation. This same view was later expressed to me by Dr. Cole.

Mr. Cooke then proceeded to obtain and study all medical records relating to Mrs. Rorrer from (1) the Moses H. Cone Memorial Hospital, (2) Dr. Sardi, (3) Dr. Stiefel, as well as copies of the reports of Dr. Cole and Drs. Joseph C. Farmer and Ng Khye Weng, doctors who practice at the Duke University Medical Center. In one report Dr. Farmer stated: "It is possible that she (Mrs. Rorrer) could have a tongue muscle injury secondary to the retraction of the tongue at the tonsillectomy, however, this is most unusual." By his affidavit Cooke states that he

construed this statement by Dr. Farmer as further supporting the supposition that the paralysis of the tongue was an injury secondary to the retraction of the tongue during the tonsillectomy, and that this was caused by pressure exerted on the tongue by the clamp in such a manner as to damage the hypoglossal nerve.

In a report dated 2 February 1972 obtained by Cooke, Dr. Cole stated:

No explanation has been found to date for the difficulty and Dr. Weng referred her to obtain a tongue biopsy. . . . Certainly the time element as far as a tonsillectomy is concerned would point to an injury at the time, however, it is impossible for me to see how a direct injury could have caused this and while doing a tonsillectomy. I have never seen or heard of a similar incidence.

In a report dated 20 March 1973, Cole further remarked: "According to Dr. Weng, there is no evidence of any other neurological disease and I told her (Mrs. Rorrer) to let me see her again in about six months for a follow-up examination." In the affidavit, discussing these reports of Cole, Cooke states:

I construed this information from Dr. Cole as ruling out any cause for paralysis of the tongue other than something that occurred during the tonsillectomy by Dr. Sardi. I was satisfied from the information from Dr. Cole, Dr. Weng, and Dr. Stiefel, that Mrs. Rorrer's condition was not psychosomatic. Based upon the information furnished to me by Mr.

and Mrs. Rorrer, by the several doctors and by all medical records, I was of the opinion that the best theory and only theory of injury to the tongue was the placing of too much pressure on the tongue by the clamp by Dr. Sardi. I was of the opinion that I needed to determine whether evidence of too much pressure on the tongue which could result in a paralysis would be in accordance with the accepted standards of practice in performing a tonsillectomy. I decided that Dr. Cole, Mrs. Rorrer's own doctor, who had first hand personal knowledge of her condition, and the resources at the Duke Medical Center at his disposal was the best source of information on this.

After waiting for some time to elapse (in hopes that plaintiff's condition would improve) Cooke met personally with Dr. Cole in 1973. Cooke's affidavit states that he

discussed with Dr. Cole the theory which was suggested by what Dr. Sardi had stated to Mr. and Mrs. Rorrer, that is, that too much pressure from the clamp used by Dr. Sardi during the operation had impaired the flow of blood to the hypoglossal nerve and had caused a paralysis thereof. Dr. Cole told me that he had never heard of a similar result following a tonsillectomy, but that there seemed to be no other explanation for Mrs. Rorrer's condition. Dr. Cole did not suggest any other possibility. This discussion with Dr. Cole caused me to believe that Dr. Cole would respond to appropriate hypothetical questions in such manner as to provide adequate and sufficient expert testimony for taking a case against Dr. Sardi to the jury. I therefore concluded that a suit on behalf of Mrs. Rorrer against Dr. Sardi should be undertaken.

Cooke filed suit against Dr. Sardi on 7 June 1974 and later took depositions of Dr. Sardi and Dr. Cole. With respect to a conference Cooke had with Dr. Cole several weeks before Cole was deposed, Cooke's affidavit remarks:

It was Dr. Cole's opinion at that time that there did not appear to be any explanation for the paralysis of Mrs. Rorrer's tongue other than the supposition of too much pressure being exerted by the clamp during the tonsillectomy. Dr. Cole did not suggest any other explanation or possibility. In response

to the hypothetical questions, Dr. Cole stated that he did have an opinion, and that it was his opinion that it would not be in accordance with the accepted standards of medical practice in the performance of a tonsillectomy for sufficient pressure to be exerted on the tongue during a tonsillectomy to cause an impairment of blood supply and damage to the hypoglossal nerve. It was my opinion and judgment as a result of this second conference with Dr. Cole that Dr. Cole was a qualified otolaryngologist and that he was prepared to testify in such way and manner as to take the negligence issue to the jury against Dr. Sardi based upon what Mr. and Mrs. Rorrer said that Dr. Sardi had stated to them. It was my best judgment that I did not need to consult with or seek to obtain the testimony of any other otolaryngologists.

Cooke took Cole's deposition on 28 August 1975. Cooke's affidavit explains that:

14. In view of the statements of Dr. Cole that he had never seen or heard of this result following a tonsillectomy, and that he could give no other possible reason for this result, it was my opinion and best judgment that the approach that I was taking in the handling of Mrs. Rorrer's claim, predicated upon what Mr. and Mrs. Rorrer said that Dr. Sardi had stated to them, was logical and sound, both from a medical and a legal standpoint.

15. Mr. and Mrs. Rorrer had gone to Dr. Cole and to the other doctors at the Duke University Medical Center for medical assistance prior to their having contacted me to represent them in a claim against Dr. Sardi. One of the reasons for Mrs. Rorrer going to Duke was to attempt to ascertain the cause of her condition. Dr. Cole was Mrs. Rorrer's treating physician, and he had not been consulted as a "paid expert" merely for the purpose of trying to make out a case against Dr. Sardi. It was my best judgment that it would be much better to use Dr. Cole as a witness than it would be to try to seek out a paid expert from some other state or some other doctor who was not personally acquainted with and who had not treated Mrs. Rorrer, and that Dr. Cole would make a stronger and more convincing witness than would some doctor called in merely to testify even if

Rorrer v. Cooke

some unknown doctor could be located who would give testimony adverse to Dr. Sardi.

Cooke explains that Cole's deposition, which was received into evidence at trial,

goes to show that he was fully qualified and experienced as an expert otolaryngologist; was an associate teaching professor at Duke Medical Center; was a practicing surgeon at Duke Hospital; was experienced in performing tonsillectomies, adenoidectomies, laryngectomies, statadectomies, and other operations; was usually in the operating room every day and performed three to five operations per day. At the time of his deposition he had been at the Duke Medical Center for six years, seeing patients' from a wide area. As both a practicing and teaching otolaryngologist, and as one of Mrs. Rorrer's treating physicians, it was my judgment that Dr. Cole provided an adequate source of information, and that I did not need to seek consultations with other otolaryngologists. The testimony of Dr. Cole identified Dr. Weng as an expert neurologist and Dr. Farmer as an expert otolaryngologist and associate professor, both at Duke Medical Center. Both saw Mrs. Rorrer. Information from them is in the trial record in the form of their reports and through the testimony of Dr. Cole. Thereby I had the benefit of information from two otolaryngologists from Duke and two neurologists in the persons of Dr. Weng and Dr. Stiefel. None of these four doctors gave to me any indication of any cause of Mrs. Rorrer's problem other than the possible pressure from the clamp used by Dr. Sardi. Dr. Sardi did not come up with any other explanation, and Dr. Sardi was the third otolaryngologist involved with the case. A careful study of the medical records of all of these doctors, and the testimony of Dr. Cole, as well as what Dr. Cole stated to me off the record, caused me to be of the opinion in my best judgment that there was no explanation for the trouble that Mrs. Rorrer had with her tongue other than damage to the hypoglossal nerve from pressure exerted by the clamp used by Dr. Sardi, and further, that the best interest of Mrs. Rorrer in my prosecution of her case against Dr. Sardi would not be served by my seeking consultations with other otolaryngologists. It was my best judgment that Mrs. Rorrer's interest was best served by

my proceeding with her case as I did through the use of Dr. Cole as the plaintiff's expert witness, and when I learned Dr. Cole would not be available for the trial I felt that it was best to introduce his testimony through his deposition rather than again delaying the trial in order to have him testify in person. In my judgment there was no need to seek out other otolaryngologists for consultation or as witnesses, based upon all the information that was available to me.

At the medical malpractice trial the Rorrers both testified that Dr. Sardi admitted to them that pressure from a tongue clamp used during surgery caused the injury to plaintiff's tongue. Sardi denied the admission. Plaintiff also presented testimony of Dr. Stiefel and the deposition of Dr. Cole. Dr. Stiefel testified that upon initially examining plaintiff he believed her paralysis was caused by some injury or involvement to the hypoglossal nerve, the nerve which controls the tongue's movement. On cross-examination, however, Dr. Stiefel stated that after examining a subsequent pathology report on a biopsy of plaintiff's tongue, he found this report to be inconsistent with injury to the nerve. Dr. Sardi's evidence included his own testimony, as well as that of Dr. William M. Satterwhite, Jr., a Winston-Salem otolaryngologist. Dr. Satterwhite was of the opinion that there was nothing Dr. Sardi did or did not do during the surgery which could have damaged plaintiff's tongue.

The jury returned a verdict for Dr. Sardi after deliberating for twenty minutes. On behalf of Mrs. Rorrer, Mr. Cooke moved that the verdict be set aside as being against the greater weight of the evidence, and the trial judge responded that he would like to postpone ruling on the motion because he was "a little surprised in the verdict." Ultimately the motion was denied. Although Cooke filed notice of appeal on behalf of Mrs. Rorrer, appeal was never perfected.

Mrs. Rorrer filed a complaint against Cooke on 26 August 1982 alleging:

8. Defendant was negligent in his representation of Mary Carol Rorrer and failed to apply the high degree of attention and care which he had agreed to in the prosecution of Mary Carol Rorrer's claim in the following respects:

a. he failed to obtain adequate expert consultations from physicians qualified to evaluate plaintiff's claim;

b. he failed to properly investigate, assemble and present relevant evidence at the trial;

c. he failed to properly cross-examine Dr. Sardi concerning his treatment and evaluation of his patient;

d. he failed to present the existing neurological evidence concerning plaintiff's tongue paralysis;

e. he failed to properly cross-examine Dr. Satterwhyte [sic], a defense witness;

f. he failed to properly cross-examine Dr. Steifel [sic];

g. he failed to locate, subpoena and present the testimony of Carol Taylor, another patient of Dr. Sardi's who experienced the same type of tongue paralysis following the same type of tonsillectomy procedure;

h. he failed to properly cross-examine Dr. Sardi concerning statements made by him to plaintiffs [sic] herein;

i. he failed to offer into evidence conversations and office records of Dr. Rosen and failed to subpoena Dr. Rosen or any of his office records;

j. he failed to perfect an appeal from the judgment entered on the verdict even though notice of appeal was given and there was no conversation held between plaintiff and defendant concerning an abandonment of any appeal.

10. As a direct and proximate result of the negligence of defendant, plaintiff Mary Carol Rorrer has been caused to lose her claim and case against Dr. Carl A. Sardi and all compensation and damages that would have been awarded to her by a jury had her claim and case been properly and adequately investigated, assembled and presented at a trial. Such damages would have included adequate and reasonable compensation for plaintiff Mary Carol Rorrer's permanent tongue paralysis and inability to speak, loss of earnings and incomes, medical and nursing expenses, pain and mental anguish for the condition which she will permanently suffer with.

[1]   On 1 October 1982 defendant moved for summary judgment and in support thereof filed eleven affidavits of Arthur O. Cooke, exhibits to these affidavits, including medical records and the full transcript of the trial of the case of *Rorrer v. Sardi*, the deposition testimony of Arthur O. Cooke, and the affidavits of W. Owen Cooke, Wayland Cooke, Judge Walter E. Crissman, and attorneys William D. Caffrey, G. Marlin Evans, Perry C. Henson, and Norman B. Smith. On his motion for summary judgment defendant had the initial burden of showing that an essential element of plaintiff's case did not exist as a matter of law or showing through discovery that plaintiff had not produced evidence to support an essential element of her claim. *E.g., Zimmerman v. Hogg & Allen*, 286 N.C. 24, 209 S.E. 2d 795 (1974); *Mortgage Co. v. Real Estate, Inc.*, 39 N.C. App. 1, 249 S.E. 2d 727 (1978), *aff'd*, 297 N.C. 696, 256 S.E. 2d 688 (1979). Plaintiff was then required to come forward with a forecast of evidence showing the existence of a genuine issue of material fact with respect to the issues raised by the movant. *See, e.g., Moore v. Fieldcrest Mills, Inc.*, 296 N.C. 467, 251 S.E. 2d 419 (1979). In support of his motion, Mr. Cooke placed into evidence facts showing that there was no actionable negligence with respect to any of the contentions in plaintiff's complaint, that each contested action on his part constituted the good faith exercise of attorney judgment, and that the essential aspect of proximate cause was absent. Mr. Cooke also placed into evidence the testimony of Dr. Cole that there was "no other explanation" for plaintiff's condition than the theory of causation which was presented to the jury.

To shift the burden under the "but for" test of causation, defendant averred that there was no evidence or witness available to or known by Cooke that could have brought about a different result in the underlying action. By discussing thoroughly the actions Cooke took and decisions made during the investigation and trial of plaintiff's case against Dr. Sardi (in the form of sixteen affidavits, Mr. Cooke's deposition, and the trial record and exhibits), we hold that defendant shifted the burden to plaintiff to show something Cooke failed to do that would have changed the result.

Plaintiff submitted the affidavits of Dr. T. Boyce Cole and attorney Tim L. Harris in opposition to Mr. Cooke's motion for summary judgment. Plaintiff contends that her two affidavits raise

genuine issues of material fact with respect to whether Cooke breached the criteria enunciated in *Hodges v. Carter*, 239 N.C. 517, 80 S.E. 2d 144, and that therefore the Court of Appeals properly reversed the trial court's entry of summary judgment in favor of defendant. Defendant argues, of course, that summary judgment was properly entered in Cooke's favor because no such issues are raised by plaintiff's affidavits. Dr. Cole's affidavit begins by reciting his involvement with the medical examination and diagnosis of Mary Rorrer's paralysis. It states that before his deposition was taken by Cooke, he and Cooke

> discussed Mr. Cooke's theory of whether the tongue retractor used during the tonsillectomy could have placed sufficient pressure on the tongue to impair blood flow and cause ischemic damage to the tongue. At that time, I told Mr. Cooke that I did not know what caused Mrs. Rorrer's tongue damage without knowing the details of the tonsillectomy procedure and I further told him that I thought it unlikely that a tongue retractor could exert enough pressure to produce this result. Mr. Cooke explained the purpose of a hypothetical question to me and asked me to assume as a hypothetical fact, that sufficient pressure was, in fact, exerted to the tongue by the tongue retractor to impair blood flow. I explained to Mr. Cooke that, assuming an impaired blood flow from whatever cause, it could have produced the tongue damage. However, I reiterated to Mr. Cooke more than once that it was my opinion that a tongue retractor could not place sufficient pressure on the tongue to caused [sic] ischemic damage. This explains my deposition testimony as to why I thought the tongue retractor theory to be an unlikely candidate for the tongue paralysis. I attempted to explain to Mr. Cooke that I could not support such a medical theory when he visited my office before taking my deposition.

The second affidavit plaintiff submitted states the following:

> My name is Tim L. Harris and I am an attorney licensed to practice law in the State of North Carolina. Part of my practice involves the specialty of preparing and trying medical malpractice cases and I have, in fact, tried these types of cases. In reading Mr. Cooke's deposition, I have become familiar with his background, training and experience with

regard to medical malpractice cases and I am further familiar with the standards of practice with attorneys with similar background and experience in communities similar to Greensboro, North Carolina, in the trial of these types of cases in May, 1978. It is my opinion that the standards of practice for attorneys who handle medical malpractice cases in communities similar to Greensboro, North Carolina, are high since preparation and trial of these actions is difficult and requires a thoroughly competent and skilled legal practitioner.

Counsel for Mrs. Mary Carol Rorrer has asked me to review certain records in this action and render my opinion as to whether or not Mr. Arthur O. Cooke complied with the standards of practice for the handling of medical malpractice cases in May, 1978, in communities similar to Greensboro, North Carolina. In preparation for the giving of my opinion, I have reviewed the following matter:

1. A copy of the transcript of the trial before Judge Crissman at the May 29, 1978, session in Guilford County, 74CVS10329;

2. The medical chart containing the notes of Dr. Sardi, the 1971 Moses Cone admission, the notes of Dr. Stiefel and the Duke Hospital records;

3. The affidavit of T. Boyce Cole;

4. The deposition of Mr. Arthur O. Cooke;

5. A statement of Robert Rorrer;

6. The nine affidavits of Mr. Cooke, together with attachments, the affidavit of Mr. Evans, the affidavit of Mr. Caffrey, the affidavit of Judge Crissman, the affidavit of Mr. Hinson [sic], the affidavit of Mr. Norman B. Smith and the affidavit of Wayland Cooke.

7. A copy of the complaint and answer.

Based upon the above information, I conclude that Mr. Cooke sought and received two medical consultations concerning the cause of the tongue paralysis of Mrs. Rorrer and whether or not Dr. Sardi's care and treatment of her met medical standards of care. He first sought the opinion of Dr.

Gray Hunter, a general surgeon in Greensboro who informed him that he had not ever heard of this result following a tonsillectomy before. As Mr. Cooke testified on page 19 of his deposition, he stated that Dr. Hunter told him that he could virtually rule out the possibility of severing or damaging the hypoglossal nerve with an instrument during the surgery. I note on page 20 of his deposition that he did not ask Dr. Hunter to consider the possibility of injuring the tongue with a tongue retractor during this surgery. I note on page 21 of Mr. Cooke's deposition that he testifies that he did not ask Dr. Hunter what could have caused the paralysis to Mrs. Rorrer's tongue. Specifically, and most importantly, I note that Dr. Hunter is a general surgeon, not an otolaryngologist, and that Mr. Cooke testifies on page 22 of his depositions that, "actually I didn't finally come to rest as the theory on which I proceeded in this case until after I had talked to Dr. Cole at Duke." In other words, Mr. Cooke relies greatly on the fact that Dr. Cole lent support to the tongue retractor theory as having caused the tongue damage. However, from a reading of Dr. Cole's medical records, and from his affidavit, it appears clear that Dr. Cole denies having lent any support to a theory that would place any blame on the tongue retractor during this surgery. Apparently, in my opinion, Mr. Cooke tried to convince Dr. Cole that sufficient pressure was placed by the tongue retractor to cause the damage and, apparently from the affidavit of Dr. Cole, Dr. Cole tried to explain to Mr. Cooke that he could not place the blame on the tongue retractor. Even if Mr. Cooke was surprised by the testimony of Dr. Cole during his deposition on August 28, 1975, there was a period of almost two and one-half years after the deposition testimony of Dr. Cole for Mr. Cooke to further investigate the cause and nature of Mrs. Rorrer's problem and to obtain further consultation as whether or not the care given by Dr. Sardi complied with accepted medical standards or not. I also note that, despite Mr. Cooke's knowledge as to the weak nature of the testimony of Dr. Cole contained in his deposition, Mr. Cooke failed to subpoena or secure the testimony of the other attending physicians which she had at Duke Hospital, including neurologists who ran electromyographic studies on her tongue which is an objective basis of proving nerve damage in the tongue and other medical witnesses. Also, I note

that Mr. Cooke failed to read or exhibit to the jurors any of the exhibits which were identified and attached to the deposition of Dr. Cole and it is also clear that some of the more favorable notes of Dr. Cole that would support the claim of Mrs. Rorrer were not identified or introduced into evidence.

On balance, and after having carefully considered the matter and the time of the trial, it is my opinion that the failure of this case was due to the fact that no medical witness supported, in any convincing manner, the medical theory which Mr. Cooke advanced at the trial. This medical theory also hampered Mr. Cooke in the cross-examination of the defendants expert witnesses. Being tied to a medical theory which was not accepted by any medical witness who gave testimony in the case was an overwhelming reason why the jury was not convinced of the merits of Mrs. Rorrer's claim. In my opinion, it is very important in the preparation and trial of a medical malpractice case to have at least one medical witness who enthusiastically and convincingly will support the plaintiff's attorney's medical theory of negligence. In this regard, Mr. Cooke failed to obtain the consultation advice of an otolaryngologist disassociated with Mrs. Rorrer's care for the purpose of thoroughly reviewing her case for the purpose of arriving at a medical theory of negligence. In 1978, there were available medical consulting agencies who could have reviewed Mrs. Rorrer's claim objectively and, if meritorious, supported her with testimony in court. Also, Dr. Cole and the other physicians at Duke may well have been more inclined to support an alternative medical theory rather than the one advanced by Mr. Cooke. Thus, it is my opinion that the representation given by Mr. Arthur O. Cooke to Mrs. Mary Carol Rorrer to and through her trial did not comply with the existing standard for the handling of medical malpractice claims in May of 1978 and communities similar to Greensboro, North Carolina. It is further my opinion that the departures from these standards of care contributed greatly to the loss of Mrs. Rorrer's claim when it was tried.

[2] We hold that the Court of Appeals erred in reversing the trial judge's entry of summary judgment in favor of defendant. Summary judgment is appropriately entered if the movant estab-

lishes that an essential part or element of the opposing party's claim is nonexistent. In a professional malpractice case predicated upon a theory of an attorney's negligence, the plaintiff has the burden of proving by the greater weight of the evidence: (1) that the attorney breached the duties owed to his client, as set forth by *Hodges*, 239 N.C. 517, 80 S.E. 2d 144, and that this negligence (2) proximately caused (3) damage to the plaintiff. As stated in *Williams v. Power & Light Co.*:

> In a negligence action, summary judgment for defendant is proper where the evidence fails to establish negligence on the part of defendant, establishes contributory negligence on the part of plaintiff, or establishes that the alleged negligent conduct was not the proximate cause of the injury. *Bogle v. Power Co.*, 27 N.C. App. 318, 219 S.E. 2d 308 (1975), *cert. denied*, 289 N.C. 296, 222 S.E. 2d 695 (1976).

36 N.C. App. 146, 147, 243 S.E. 2d 143, 144, *rev'd on factual grounds*, 296 N.C. 400, 250 S.E. 2d 255 (1978). *See* Comment, *Summary Judgment: A Comparison of Its Application by North Carolina and Federal Courts in Negligence Actions*, 9 Wake Forest L. Rev. 523 (1973). In the instant case, as we explain below, plaintiff's affidavits do not sufficiently forecast evidence that would prove that in his representation of plaintiff Cooke failed to conform to the criteria enunciated in *Hodges*. Further, plaintiff's affidavits fail to show that any such alleged negligence proximately caused her any damage.

## I. NEGLIGENCE ASPECT

The materials submitted by plaintiff do not raise any material issue of fact with respect to whether Mr. Cooke breached the general duties of care set forth in *Hodges*. In item eight of her complaint against Cooke, plaintiff lists ten acts which Cooke allegedly did not perform in the course of his representation of her. Three of these concern largely pretrial investigation; the remainder allege certain inactions after trial commenced. Neither these allegations nor the affidavits submitted in opposition to defendant's motion for summary judgment establish the existence of a factual question of whether Mr. Cooke negligently misrepresented Mrs. Rorrer in her suit against Dr. Sardi.

[3] The third prong of *Hodges* requires an attorney to represent his client with such skill, prudence, and diligence as lawyers of ordinary skill and capacity commonly possess and exercise in the performance of the tasks which they undertake. The standard is that of members of the profession in the same or similar locality under similar circumstances. *See Wright v. Williams*, 47 Cal. App. 3d 802, 810, 121 Cal. Rptr. 194, 199 (1975). Expert testimony is helpful to establish what the standard of care as applied in the investigation and preparation of medical malpractice lawsuits requires and to establish whether the defendant-attorney's performance lived up to such a standard. *E.g., Kirsch v. Duryea*, 21 Cal. 3d 303, 146 Cal. Rptr. 218, 578 P. 2d 935 (1978); *Wilkinson v. Rives*, 116 Cal. App. 3d 641, 172 Cal. Rptr. 254 (1981). *See generally* Annot., 14 A.L.R. 4th 170 (1982); Annot., 17 A.L.R. 3d 1442 (1968 & Supp. 1984); McIntosh and King, *Legal Malpractice—Inadequate Case Investigation*, 16 Am. Jur. Proof of Facts 2d 549, 567 (1978); Breslin and McMonigle, *The Use of Expert Testimony in Actions Against Attorneys*, 47 Ins. Couns. J. 119 (1980); Hutcheson and Monroe, *Actions Against Attorneys for Professional Negligence*, 14 Am. Jur. Trials 265, 289-91 (1968); McCain, *The Malpractice Trial—Causation, Liability and Damages,* in *North Carolina Professional Malpractice* 340, 343 (Wake Forest L. School 1983). *Cf., e.g., Stevenson v. Nauton*, 71 Ill. App. 3d 831, 390 N.E. 2d 53 (1979); *Dorf v. Relles*, 355 F. 2d 488 (7th Cir. 1966). In opposition to defendant's motion for summary judgment, plaintiff submitted her complaint, the affidavit of Dr. Cole, and the affidavit of one attorney, Tim Harris, who testified as an expert with respect to Cooke's preparation and trial of Mrs. Rorrer's claim. Because it fails to state what the standard of care to which Cooke was subject required him to do, we hold that the affidavit of Harris is insufficient to forecast proof that Mr. Cooke's preparation for and conduct of trial was such that Cooke breached his duty of due care and diligence to Mrs. Rorrer. The closest the Harris affidavit comes to setting forth a standard of care for the handling of a medical malpractice case is the statement that "the standards of practice . . . are high." Although the Harris affidavit does outline several things that Cooke did not do and that presumably Harris would have done had he tried Mrs. Rorrer's case against Dr. Sardi (and tried it with the benefit of hindsight gained by the instant suit), the affidavit nowhere states that Cooke's inaction violated a standard of care required of similarly

situated attorneys. Harris's statement that "[i]n my opinion, it is very important in the preparation and trial of a medical malpractice case to have at least one medical witness who enthusiastically and convincingly will support the plaintiff's attorney's medical theory of negligence"[2] is merely an opinion. The affidavit does not state that the standard of care in such cases required Cooke to obtain such a witness. The mere fact that one attorney-witness testifies that he would have acted contrarily to or differently from the action taken by defendant is not sufficient to establish a prima facie case of defendant's negligence. The law is not an exact science but is, rather, a profession which involves the exercise of individual judgment. Differences in opinion are consistent with the exercise of due care. Similarly, Harris's allegations that "[i]n 1978 there were available medical consulting agencies who could have reviewed Mrs. Rorrer's claim objectively and, if meritorious, supported her with testimony in court . . . [and] the . . . physicians at Duke may well have been more inclined to support an alternative medical theory rather than the one advanced by Mr. Cooke" do not aver that the standard of care by which Cooke's conduct is to be measured required him to pursue this line of investigation. All we are left with is a conclusory statement that "it is my opinion that the representation given by Mr. Arthur O. Cooke to Mrs. Mary Carol Rorrer to and through her trial did not comply with the existing standard for the handling of medical malpractice claims in May of 1978 and communities similar to Greensboro, North Carolina." Given that the Harris affidavit was the only item[3] presented to the trial judge on behalf of plaintiff's contention that Cooke breached his duty of care to Mrs. Rorrer in (1) investigating her claim before trial and (2) conducting the trial itself, we hold that plaintiff failed to forecast any evidence that Mr. Cooke in fact breached his duty of reasonable care and diligence in the prosecution of Mrs. Rorrer's suit against Dr. Sardi.

---

2. We note that such may also be the case in an action based on legal malpractice predicated upon a theory of negligence.

3. The affidavit of Dr. Cole does not support plaintiff's contention that Cooke breached a duty to obtain additional expert testimony. Plaintiff did not establish that Cooke had any such duty, and the statements in Cole's affidavit are consistent with those he made to Cooke as the case against Sardi was being prepared.

[4]  We further hold that plaintiff's affidavits fail to establish material issues of fact with respect to the second prong of the *Hodges* test.

> Every counsel in practice knows that daily he is faced with the question whether in his client's interest he should raise a new issue, put another witness in the box, or ask further questions of the witness whom he is examining or cross-examining. That is seldom an easy question but I think that most experienced counsel would agree that the golden rule is — when in doubt stop. Far more cases have been lost by going on too long than by stopping too soon. But the client does not know that. To him brevity may indicate incompetence or negligence and sometimes stopping too soon is an error of judgment. So I think it not at all improbable that the possibility of being sued for negligence would at least subconsciously lead some counsel to undue prolixity, which would not only be harmful to the client but against the public interest in prolonging trials. Many experienced lawyers already think that the lengthening of trials is not leading to any closer approximation to ideal justice.

*Rondel v. Worsley*, 3 All E.R. 993, 999 (H.L. 1967). There is no evidence of record that Mr. Cooke failed to exercise his best judgment in good faith at every decision point arising in the preparation for and trial of Mrs. Rorrer's suit against Dr. Sardi. Good faith is an objective, not subjective, standard. Defendant's affidavits establish that before making each decision involved in the suit — such as whether to consult additional witnesses or to pursue further cross-examination of a given witness — Cooke was informed of the pertinent legal issues and strategies and made decisions based only on the welfare of his client and her suit. Absent any evidence of a standard of care with which Cooke failed to comply and absent a showing that Cooke failed to exercise his best, informed judgment, he is immune from any allegedly erroneous judgmental decisions made during the preparation and trial of Mrs. Rorrer's lawsuit against Dr. Sardi. *Hodges v. Carter*, 239 N.C. 517, 80 S.E. 2d 144. *See Rondel v. Worsley*, 1 All E.R. 467 (Q.B. 1966), 3 All E.R. 657 (C.A. 1966), 3 All E.R. 993 (H.L. 1967); *Stricklan v. Koella*, 546 S.W. 2d 810 (Tenn. Ct. App. 1976), *cert. denied*, 546 S.W. 2d 810 (1977); Haskell, *The Trial Lawyer's Immunity from Liability for Errors of Judgment*, 1979 The Trial

Lawyer's Guide 87. *Cf. In re Watts and Sachs*, 190 U.S. 1, 47 L.Ed. 933 (1903); *Quality Inns v. Booth, Fish, Simpson, Harrison and Hall*, 58 N.C. App. 1, 292 S.E. 2d 755 (1982). *See generally* Beck, *Legal Malpractice: Trial Lawyers and the Error-In-Judgment Rule*, 52 Ins. Couns. J. 50 (January 1985). As plaintiff has not come forward with any evidence that would support her claim that Cooke's representation of her was negligent, summary judgment was properly entered against her.

Even assuming arguendo that she had set forth materials showing the existence of issues of fact with respect to Cooke's alleged negligence, we hold that Mrs. Rorrer's affidavits do not forecast evidence that would show that Cooke's alleged negligence was a proximate cause of the loss of her suit against Sardi.

## II. PROXIMATE CAUSATION

[5] Preliminarily, however, we must address plaintiff's contention that the issue of the proximate causation of Mrs. Rorrer's alleged damages by virtue of the loss of the medical malpractice suit is not before this Court. Plaintiff contends that because defendant's motion for summary judgment did not raise causation as an issue, plaintiff, as the responding party, was not required to bring forward affidavits or other materials addressing this issue. Defendant's motion is set forth as follows:

> The defendant, through counsel, hereby renews his motion, as set forth in his first further defense in his answer filed herein, for dismissal of this action, with prejudice, for failure to state a claim upon which relief may be granted, under Rule 12(b)(6) of the Rules of Civil Procedure.

> In the alternative, the defendant, through counsel, respectfully moves for summary judgment, in his favor, pursuant to the provisions of Rule 56 of the Rules of Civil Procedure, and as grounds therefor shows unto the court that there is no genuine issue as to any material fact as to there being no negligence on the part of the defendant in relation to the preparation and prosecution of the claim of Mary Carol Rorrer against Dr. Carl Sardi. Affidavits and the full record of the trial referred to in the plaintiff's complaint were filed in an earlier action involving the same plaintiff and this same

defendant and the same subject matter, this being 81CVS198, in which the plaintiff took a voluntary dismissal on August 31, 1981. The defendant request[s] that these affidavits and the full record of the trial of the case against Dr. Sardi be considered by the court in support of this motion, along with any additional affidavits or other materials that may be filed herein.

In support of the motion defendant submitted many affidavits, a number of which specifically address the issue of whether the alleged negligence of Cooke was a proximate cause of Mrs. Rorrer not obtaining a jury verdict against Dr. Sardi. Defendant thus placed the issue of causation squarely before the trial court, and it became incumbent upon plaintiff to submit affidavits in opposition to this and other issues so presented. If plaintiff was unprepared to introduce affidavits with respect to causation by the time of the hearing on defendant's motion for summary judgment, she should have moved for a continuance under Rule 56(f) of the North Carolina Rules of Civil Procedure:

> (f) *When Affidavits are Unavailable.* Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

As she did not do so, it is deemed that plaintiff was satisfied with the strength of her opposition to defendant's motion.[4] As proximate cause was an issue before the trial court, it is also now properly before this Court.

[6, 7] Generally, the principles and proof of causation in a legal malpractice action do not differ from an ordinary negligence case.

---

4. We note that plaintiff originally filed this action against Arthur O. Cooke, W. Owen Cooke, and A. Wayland Cooke on 23 February 1981. When defendants' motion for summary judgment came on for hearing on 31 August 1981, plaintiff took a voluntary dismissal of that action without prejudice. The instant case was refiled against Arthur O. Cooke on 26 August 1982, and hearing on defendant's motion for summary judgment was held during the 10 January 1983 session of superior court. It would thus appear that plaintiff had sufficient opportunity to prepare whatever materials she wished to submit in opposition to defendant's motion.

*See Murphy v. Edwards and Warren*, 36 N.C. App. 653, 245 S.E. 2d 212 (Mitchell, J.), *disc. rev. denied*, 295 N.C. 551 (1978); Annot., 45 A.L.R. 2d 5 (1956). To establish that negligence is a proximate cause of the loss suffered, the plaintiff must establish that the loss would not have occurred but for the attorney's conduct. *Maryland Casualty Co. v. Price, Smith, Spilman & Clay*, 224 F. 271 (S.D. W. Va. 1915), *aff'd*, 231 F. 397 (4th Cir. 1916). *See generally* R. Mallen and V. Levitt, *Legal Malpractice* § 102 (2d ed. 1981); D. Meiselman, *Attorney Malpractice: Law and Procedure* § 3.3 (1980 & Supp. 1984); Coggin, *Attorney Negligence . . . A Suit Within a Suit*, 60 W. Va. L. Rev. 225 (1958). Where the plaintiff bringing suit for legal malpractice has lost another suit allegedly due to his attorney's negligence, to prove that but for the attorney's negligence plaintiff would not have suffered the loss, plaintiff must prove that:

(1) The original claim was valid;

(2) It would have resulted in a judgment in his favor; and

(3) The judgment would have been collectible.

McIntosh and King, *supra*, 16 Am. Jur. Proof of Facts 2d 549, 571; D. Meiselman, *supra*, §§ 3.4, .5; Annot., 45 A.L.R. 2d 5, § 7 (1956). *See Masters v. Dunstan*, 256 N.C. 520, 124 S.E. 2d 574 (1962); *Blue Ridge Sportcycle Co. v. Schroader*, 60 N.C. App. 578, 299 S.E. 2d 303 (1983).

[8] We agree with defendant that plaintiff's contention that Mr. Cooke should have done something more than he did in preparation for trial is without meaning or significance absent the establishing of (1) specific evidence that Cooke could have gathered and, under the prevailing standard, should have gathered and presented at trial, and (2) its impact on the outcome of the trial against Dr. Sardi. The materials produced by plaintiff in response to defendant's motion for summary judgment have failed to forecast any evidence showing that had Mr. Cooke done anything differently plaintiff would have been successful in her litigation against Dr. Sardi.

Plaintiff has failed to show: who should or could have been consulted; what any person consulted would have said; whether any person consulted would have supported the pressure theory; whether any other theory or explanation for plaintiff's injury has

ever existed; whether any person consulted would have supported any other theory; or whether any person consulted would have been available to testify. We note that Dr. Cole's affidavit filed in opposition to defendant's motion for summary judgment fails to offer any alternative explanation for Mrs. Rorrer's injury. The Harris affidavit is insufficient in the same respect. Plaintiff has failed to show that there was any other or better theory or any additional admissible evidence other than what Mr. Cooke considered and used.

We further note that Harris's conclusory statement that the (alleged) departure from standards of care "contributed greatly to the loss of Mrs. Rorrer's claim when it was tried" is deficient in several respects. Not only is it not based upon specific facts, see *Lowe v. Bradford*, 305 N.C. 366, 289 S.E. 2d 363 (1982), it does not aver that but for Cooke's negligence Mrs. Rorrer would have prevailed in her suit against Dr. Sardi. The affidavit offers no specific facts suggesting how Cooke's alleged departure from the (again unenunciated) standard of care in prosecuting medical malpractice suits could or might have caused a jury to decide against Mrs. Rorrer, or how further preparation and investigation by Cooke would have produced a different result. Therefore, no genuine issue of material fact existed with respect to the issue of whether the loss of Mrs. Rorrer's suit against Dr. Sardi was proximately caused by defendant's negligence.

Summary judgment was properly entered for defendant. The decision of the Court of Appeals is

Reversed.